654 F.2d 616
 AIR CALIFORNIA, a California corporation, and Clarence
Turner, Petitioners- Appellants,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION; Andrew Lewis as
Secretary of the Department of Transportation; Federal
Aviation Administration; Charles E. Weithoner as Acting
Administrator of the Federal Aviation Administration; Albert
B. Randall, Acting Chief Counsel, Federal Aviation
Administration,* Respondents- Appellees.
Nos. 80-7279, 80-5621.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1980.
Decided Aug. 27, 1981.
 
 Philip K. Verleger, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for petitioners-appellants.
 David Shilton, App. Section Dept. of Justice, Washington, D.C., argued, for respondents-appellees; James W. Moorman, Asst. Atty. Gen., Washington, D.C., on brief.
 Petition for Review of FAA Action and Appeal from the United States District Court for the Central District of California.
 Before CHOY and NELSON, Circuit Judges, and HANSON,** Senior District Judge.
 CHOY, Circuit Judge:
 
 
 1
 Air California, one of two air carriers operating jet service from Orange County Airport (airport) prior to the actions here in issue, and Clarence Turner, who lives in the vicinity of the airport, petition this court to review actions of the Federal Aviation Administration (FAA), primarily a letter sent by its Chief Counsel to the Orange County Board of Supervisors (Board). They also appeal from a dismissal of a parallel attack on the letter in district court. They contend that the FAA erroneously interpreted applicable law in determining that the Board must permit new carriers to use the airport and improperly coerced the Board's compliance.[1]
 
 
 2
 Because we find that the letter did not constitute an "order" under 49 U.S.C. § 1486(a), we deny the petition for lack of jurisdiction. We also affirm the district court's dismissal of the case as unripe for review.
 
 I. Facts
 
 3
 Soon after Orange County Airport[2] was first equipped to accommodate jet aircraft in 1967, two airlines, Bonanza and Air California, applied for and were granted permission to operate turbojet service from the airport. With the growth of jet service, noise became a significant problem in the communities surrounding the airport, and in 1970 the Board adopted a formal policy designed to freeze the level of airport operations. Accordingly, the Board decided to: oppose new applications for interstate service from the airport; deny terminal leases to new air carriers; prohibit operations by aircraft over a certain weight; and disapprove applications for facility improvements, despite the fact that airport use had already reached the designed capacity of the existing facilities. The Board subsequently restricted the hours during which jet aircraft could operate and limited the number of daily jet flights to 40. These policies resulted in the exclusion of new carriers, which had sought authorization to operate turbojet service from the airport since 1969. As a result, Air California and Hughes Airwest, a corporate successor to Bonanza, continued to provide the only turbojet service from the airport.[3]
 
 
 4
 Between 1970 and 1978, the Board entered into five contracts with the FAA in order to obtain federal airport funds, thereby subjecting itself to the requirements of federal statutes administered by the FAA. These statutes prohibit recipients of federal funds from granting an "exclusive right" of airport use, 49 U.S.C § 1349(a), or from engaging in "unjust discrimination" among airport users, 49 U.S.C. § 1718(1). In 1979, the FAA issued notice of a hearing to investigate claims by unsuccessful airline applicants that the Board was violating federal law. The FAA at that time advised the Board not to enter into any long-term leases pending the completion of the investigation. Air California, which had been negotiating a new long-term lease with the Board, petitioned the FAA to conduct the hearing in accordance with the formal requirements of the Administrative Procedures Act (APA). This petition was denied.
 
 
 5
 The FAA's Western Regional Counsel, DeWitte Lawson, presided over a four-day investigatory hearing in which Air California, the Board, and various community groups participated. Following the hearing, Lawson issued a report reviewing the history of the noise-related restrictions at the airport and concluding that a continued denial of access to new carriers would constitute a violation of the governing statutes. He expressed sympathy with the airport's noise problem and suggested alternative actions which the Board might take in order to achieve compliance.[4] He recommended, however, that the FAA pursue administrative and legal sanctions against the Board if it refused to authorize new carriers.
 
 
 6
 On April 3, 1980, the FAA's Chief Counsel, Clark Onstad, sent a letter to the chairman of the Board announcing Onstad's concurrence in the conclusions reached in Lawson's report. Onstad warned that a failure to undertake negotiations to accommodate new carriers "will warrant our pursuance of contractual, injunctive, and civil penalty remedies." He further stated that the FAA would take no formal action for a period of 30 days in order to permit the Board an opportunity to comply.[5] He commented briefly upon Lawson's suggestions for reconciling the Board's noise concerns with the entry of new carriers and offered FAA aid in resolving the problem. He did not, however, specify a particular course of action beyond the initiation of negotiations with the applicants.
 
 
 7
 The FAA has never taken the formal action mentioned in the April 3 letter. During the summer of 1980, FAA correspondence with the Board urged speedier action and suggested that future federal funding would be jeopardized by Board recalcitrance. In response to an inquiry by Congressmen Norman Mineta and Glenn Anderson, Onstad suggested a general course of Board actions which would constitute compliance, including adoption of an interim plan which would allocate a certain number of flights to new carriers within 60 days. He did not specify whether those flights necessarily would be taken from the incumbents, but noted that the FAA would not require that the Board take actions which would increase the cumulative noise level.
 
 
 8
 On September 10, 1980, the Board met and agreed to prepare an interim plan which would reduce the number of authorized flights for Air California and Hughes Airwest and reallocate them to other carriers. Representatives of Air California attended and argued that the FAA's position misconstrued the relevant statutes. Comments by members of the Board, however, revealed no willingness to challenge the FAA.
 
 
 9
 Prior to the meeting, Air California sought judicial review of the April 3 letter, contending that it would suffer substantial economic loss if the Board submitted to the FAA's demands by reallocating flights from Air California to new carriers. It brought suit both in the district court and in this court, raising identical arguments: (1) that the FAA action violated the National Environmental Policy Act in that no Environmental Impact Statement was prepared; (2) that the FAA action flowed from an erroneous interpretation of the applicable federal law regarding exclusive rights and unjust discrimination; and (3) that the FAA action violated the procedures set forth in the Administrative Procedures Act (APA). The district court dismissed the action on the ground that the issues were not ripe for review and that no case or controversy existed. The appeal from the district court was consolidated with a petition for review of the FAA action by this court.
 
 II. Appellate Jurisdiction
 
 10
 Because this court is a court of limited jurisdiction, we are empowered to hear only those cases which fall within the scope of a statutory grant of jurisdiction. California ex rel. Younger v. Andrus, 608 F.2d 1247, 1249 (9th Cir.1979); C. Wright, Law of Federal Courts § 7 (3d ed.1976). Air California argues that the FAA's actions are reviewable under 49 U.S.C. § 1486(a), which provides that "(a)ny order, affirmative or negative, issued by the ... Administrator under this chapter ... shall be subject to review" in the courts of appeals upon petition filed "by any person disclosing a substantial interest in such order." The reviewability of the FAA's actions in this case thus turns upon whether or not the FAA General Counsel's April 3, 1980 letter is properly characterized as an "order." Although the APA defines "order" expansively as "the whole or a part of a final disposition ... of an agency in a matter other than rule making," 5 U.S.C. § 551(6), the power to review FAA orders has been judicially restricted to review of final agency orders. Rombough v. FAA, 594 F.2d 893, 895-96 n.4 (2d Cir.1979); Puget Sound Traffic Ass'n v. CAB, 536 F.2d 437, 438-39 (D.C. Cir.1976). Because the FAA's actions here lacked the requisites of finality, we find that they did not constitute a reviewable order.
 
 
 11
 The Supreme Court recently addressed the issue of "final agency action" in holding that the Federal Trade Commission's issuance of a complaint based upon its "reason to believe" that a violation had occurred was unreviewable because it was not final. Federal Trade Commission v. Standard Oil of California 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). The decision reversed a ruling by this court that the question whether the FTC had properly made a "reason to believe" determination or had merely succumbed to political pressure was reviewable. Standard Oil of California v. Federal Trade Commission, 596 F.2d 1381, 1384 (9th Cir.1979). The Court distinguished the issuance of the FTC complaint from the situation involved in the earlier case of Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which held that Food and Drug Administration regulations were final and ripe for review before the FDA sought enforcement. The Court noted several characteristics of the FDA regulations which distinguished them from the FTC's complaint, including that: they were "definitive" statements of the FDA's position; they had a "direct and immediate" effect on the day-to-day business of the complaining parties; they had the "status of law"; and "immediate compliance with their terms was expected." Standard Oil, 449 U.S. at 239, 101 S.Ct. at 493, quoting Abbott Laboratories, 387 U.S. at 151-53, 87 S.Ct. at 1516-18. In contrast, the FTC's averment of "reason to believe" a violation existed was not a definitive statement of position, but a "threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." Standard Oil, 449 U.S. at 241, 101 S.Ct. at 493. Nor did the issuance of the FTC complaint have a legal force comparable to that of the FDA regulation, as it burdened the complaining party only to the extent of requiring a response to the charges against it. Standard Oil, id. at 494. Furthermore, where the challenge to the FDA regulations was "calculated to speed enforcement" of the regulatory scheme, Abbott Laboratories, 387 U.S. at 154, 87 S.Ct. at 1518, judicial review of the FTC's complaint was likely to produce interference in the proper functioning of the agency and a burden for the courts. Standard Oil, 449 U.S. at 241, 101 S.Ct. at 494. These factors led the Court to conclude that the complaint was not "final agency action." Id. at 495.
 
 
 12
 Two salient characteristics of the agency action here in issue persuade us that Standard Oil, and not Abbott Laboratories, should control: 1) its informal nature, and 2) its indirect effect upon the complaining party.
 
 
 13
 The April 3 letter was neither a definitive statement of the agency's position nor a document with the status of law. The letter indicated the FAA General Counsel's concurrence in the Presiding Officer's opinion that the Board was in violation of statutes governing the use of federal funds administered by the FAA. It also indicated the agency's intention to pursue sanctions if the Board did not take steps to comply with that interpretation by "accommodating" other airline applicants. The letter did not specify the exact form that compliance would take, but rather commented, briefly and tentatively, upon alternatives suggested in the investigative report and offered aid in the Board's attempt to comply. Thus, as an indication of the agency's interpretation of the law, the letter resembles the "reason to believe" determination at issue in Standard Oil. Indeed, the letter's legal status is even less determinate, as it did not initiate an agency process. Administrative orders are not final and reviewable "unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 112-113, 68 S.Ct. 431, 436-437, 92 L.Ed. 568 (1948); Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1020 n.5 (9th Cir.1980). The April 3 letter did none of these.[6]
 
 
 14
 Unlike the situation in Abbott Laboratories, the effect of the FAA's actions on Air California was not direct and immediate. The actions taken by the Orange County Board of Supervisors at its September 10, 1980 meeting formed the necessary intervening link between the pressure applied by the FAA and the effect felt by Air California. When the petition for review was filed, the Board had not yet responded to the April 3 letter. It ultimately decided to acquiesce in the FAA's interpretations rather than challenge them in a subsequent enforcement action. It also determined, within a framework suggested by the FAA, the form that compliance would take. Thus the Board controlled the availability of judicial review of the challenged interpretations, as well as the consequences which flowed from them. We are loath to recognize a test of final agency action which would turn upon a regulated party's will to resist.
 
 
 15
 Air California adduces statements made by members of the Board indicating that their action in reallocating Air California's allotted flights was coerced by FAA pressure. While the desire to avoid litigation and the danger of losing federal funding no doubt exerted strong pressure on the Board, it did not relieve the Board of responsibility for its decision.[7] This court previously has indicated that concepts of coercion and duress are inappropriate in characterizing dealings between federal and state governments. Shell Oil Co. v. Train, 585 F.2d 408, 413-14 (9th Cir.1978).[8] That is necessarily true, as well, of the interaction between the federal government and the Board, a creature of state government.
 
 
 16
 Flexibility is essential to the administrative process. Where the regulator and the regulated can achieve accommodation without resort to litigation, as here, we are reluctant to intervene at the behest of a third party. Intrusion into the administrative process by characterizing intermediate agency actions as final and reviewable can only burden the agency and the courts. Because there was no "final agency action" here, and hence no "order," we have no jurisdiction to review the FAA's actions.
 
 III. District Court Jurisdiction
 
 17
 On July 28, 1980, the district court entered judgment dismissing this action for lack of jurisdiction on the grounds that the issues were not ripe for review and that no case or controversy had been presented. We affirm.
 
 
 18
 At the time the court made its ruling, the Board had not yet met and decided to reallocate flights from Air California. The district court was asked to review FAA actions consisting of the findings of an investigatory hearing and advisory letters that did not require specific action. Thus the harm complained of was at that time speculative and the issues unripe for determination. See Boating Industry Associations v. Marshall, 601 F.2d 1376, 1384 (9th Cir.1979). The decision of the district court dismissing this action is AFFIRMED; the Petition for Review is DENIED.
 
 NELSON, Circuit Judge, dissenting:
 
 19
 The doctrine limiting judicial review to "final" agency action is a beneficial one, avoiding the premature and inefficient entanglement of courts in agency proceedings that have not advanced beyond a preliminary stage. I cannot, however, agree with my colleagues that this case presents that situation. The criteria of finality articulated by the Supreme Court[1] and elaborated by the Courts of Appeals[2] all point to a finding of finality in this instance. By not making such a finding here, this Court insulates a substantial agency action with extensive and immediate consequences for the affected parties from judicial review now and, in all likelihood, at any time. While I certainly have no masochistic urge to expand the workload of the federal courts, I fear that today's decision may represent a roadmap for agencies wishing to take actions without risking judicial review. In my view, the FAA's actions are sufficiently "final" to confer on this Court jurisdiction to review them. I must accordingly dissent.
 
 
 20
 * The Supreme Court's Standard Oil decision, which was handed down after argument in the instant case, does not seem to me to "control" this case. Standard Oil held that an agency's decision to institute proceedings against a party was not a "final" action subject to immediate judicial review. The instant case does not fit that description, however. The instant case reached a stage comparable to that addressed in Standard Oil at the time the FAA General Counsel informed the parties of the agency's decision to convene an investigatory hearing pursuant to its authority under 49 U.S.C. § 1482(b). The FAA's decision to investigate whether the airport was in compliance with statutory requirements closely resembles the FTC's "reason to believe" averment in Standard Oil, and it is clear that judicial review at that time would be premature.
 
 
 21
 Now, however, we face a different situation. What happened here can legitimately be viewed as a completed process, starting with the initiation of an investigation into airport practices, proceeding through a formal hearing and report, and culminating in the General Counsel's April 3rd letter. We have more than an agency's decision to take a look at something; this agency has taken that look, drawn conclusions from it, and, for all practical purposes, taken the steps necessary to implement those conclusions. While further agency action is always possible, the matter is now at a stage amenable to review by this Court.
 
 
 22
 Standard Oil cannot be read as abrogating earlier Supreme Court pronouncements regarding the availability of judicial review of agency action. Indeed, not only did the Standard Oil court explicitly rely on and reaffirm the basic criteria set forth in the leading Abbott Laboratories case, it reconfirmed the basic principle of Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950): An agency's statutorily required preliminary finding of "cause" to proceed against a party cannot itself be challenged through a separate action for direct review, but may be attacked, if ever, only in connection with review of the substantive proceeding that follows. Again, because the instant case has gone far beyond the stage of initial determination to proceed, neither the Ewing nor the Standard Oil precedents control.
 
 
 23
 Abbott Laboratories counsels that courts, in order to avoid "entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," must evaluate two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 148-49, 87 S.Ct. at 1515-16. Determination of whether an agency action is "final" so as to be fit for judicial consideration is to be both "pragmatic" and "flexible." Id. at 149-50, 87 S.Ct. at 1515-16. Important to the Abbott Laboratories Court's finding of finality were a number of practical considerations: the challenged regulations represented "definitive" statements of the agency's position; they had a direct and immediate effect on the day-to-day business of the petitioners; and immediate compliance with the regulations was expected. Id. at 151-53, 87 S.Ct. at 1516-18; see Standard Oil, 449 U.S. at 239, 101 S.Ct. at 493.
 
 
 24
 The Standard Oil Court, applying these factors, noted that the issuance of a complaint against the petitioner had "no legal force comparable to the regulation at issue in Abbott Laboratories, nor any comparable effect on (Standard's) daily business ... except to impose upon (Standard) the burden of responding to the charges made against it. Although this burden certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." 449 U.S. at 242, 101 S.Ct. at 494. Applying these factors to the instant case, however, I conclude that finality exists. The agency position is perfectly clear, both from the detailed report produced by the hearing examiner and the subsequent letters from the FAA General Counsel. The proceeding had immediate and concrete consequences for Air California. Prompt compliance with the FAA's "advice" was plainly expected, and indeed the letters from the FAA were calculated to produce results. The record produced by the agency is adequate for judicial review. While the agency letter may not have precisely the same "status of law" as the regulations challenged in Abbott Laboratories, the finding of probable violation of law had important legal significance in that it formed the basis for the FAA's exercise of authority to withhold federal funds from the airport.
 
 
 25
 It seems to me somewhat disingenuous for the FAA to argue, as it has here, that it is merely "in the middle of" an ongoing proceeding. So long as the airport operator capitulates to FAA demands, nothing further remains of the agency process. Yet as a result of the FAA procedure, two of Air California's flights have been taken away. If the airline cannot obtain review at this stage, it had no remedy unless the airport operator decides to fight the federal government rather than acquiesce. Thus, while further agency action is always possible, that possibility does not undercut a finding of finality here. The primary focus of inquiry should be on what the agency has already done.[3]
 
 II
 
 26
 Another portion of the Standard Oil opinion, not cited by the majority, sheds considerable light on our decision today. In that portion, Justice Powell listed a number of factors that opposed the judicial review sought by the petitioner. Review of the issuance of the complaint, he noted, would produce interference with the proper functioning of the agency, and create a burden for the courts. Premature intervention would deny the agency an opportunity to correct its own mistakes and apply its expertise. It would lead to "piecemeal review which at the least is inefficient and upon completion of the agency process might prove unnecessary." Review to determine whether the agency had sufficient cause to institute proceedings would delay resolution of the ultimate question of whether the law had been violated. In any event, a finding of reviewability would inundate courts with such challenges, because every respondent to an FTC complaint could mount a similar challenge. "Judicial review of the averments in the Commission's complaints should not be a means of turning prosecutor into defendant before adjudication concludes." 449 U.S. at 243, 101 S.Ct. at 494.
 
 
 27
 Even without undertaking a lengthy analysis of these factors, I think it apparent that the instant case does not present comparable difficulties. Thus not only does the case possess the requisite indicia of finality, it lacks countervailing concerns that would counsel against our review at this time.
 
 III
 
 28
 The determination of when agency action may be reviewed, based as it is on practicality, efficiency, and common sense, requires the exercise of considerable judgment on the part of the courts in which review is sought. The following statement from a D.C. Circuit case is instructive:
 
 
 29
 The label an agency attaches to its action is not determinative. The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect. Indeed, agency action may be reviewable even though it is never to have any formal, legal effect. What is required is that the interests of the court and agency in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the challenged action's "immediate and practical impact" upon them (quoting Frozen Food Express v. United States, 351 U.S. 40, 44 (76 S.Ct. 569, 571, 100 L.Ed. 910) (1956)).
 
 
 30
 Continental Air Lines, Inc. v. CAB, 522 F.2d 107, 124-25 (D.C. Cir.1974) (en banc) (footnotes omitted). In my judgment, the balance swings in favor of review in this case.
 
 
 31
 I would take jurisdiction of Air California's petition for review.[4]
 
 
 
 *
 The current occupants of these positions are substituted for their predecessors, Neil Goldschmidt as Secretary of the Department of Transportation, Langhorne Bond as Administrator of the Federal Aviation Administration, and Clark H. Onstad as Chief Counsel of the Federal Aviation Administration, pursuant to Fed.R.App.P. 43(c)
 
 
 **
 The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 Clarence Turner, who joined Air California in the suit and petition for review, argues that the FAA's actions ultimately will cause an increase in the noise levels at his residence near the airport. For convenience, and because Air California presents the more immediate claim of harm, we will use "Air California" to denote both petitioners
 
 
 [2]
 Orange County Airport is now known as John Wayne Airport
 
 
 [3]
 As of 1979, an average of 26 flights of the 40-flight daily limit were allocated to Air California and an average of 14 daily flights to Hughes Airwest. In addition, Golden West Airlines operated small non-turbojet commuter flights from the airport
 
 
 [4]
 Among Lawson's suggestions were that the Board: (1) increase the number of daily departures so as to accommodate new carriers; (2) reduce the number of daily departures allotted to incumbent carriers in a manner which would assure fair and equal treatment to all carriers; and (3) reallocate the terminal facilities so as to allow access to new carriers in a fair and equitable manner
 
 
 [5]
 The full text of the crucial paragraph of the April 3 letter read as follows:
 Based on the Report of Investigation, I concur in the Presiding Officer's conclusion that, if the County of Orange fails to accommodate qualified air carriers applying for entry to John Wayne Airport, the County will have (1) granted exclusive rights to incumbent carriers in violation of Section 308(a) of the Federal Aviation Act and (2) unjustly discriminated against such applicants in violation of the County's contractual obligations under the Airport and Airway Development Act of 1970. In short, the County's failure to accord essentially equal treatment to all qualified air carriers cannot be countenanced. Certain air carrier applications have been pending before the County for some time and negotiations to accommodate these and other qualified applicants should be undertaken without further delay. Failure to do so will warrant our pursuance of contractual, injunctive and civil penalty remedies. In order to afford the County an opportunity to take action on the requests of qualified air carriers and the commuter carrier, we will take no formal action for a period of thirty (30) days following your receipt of this letter. In this effort, the FAA recognizes the impact of total change on the incumbents; therefore, the FAA believes that a reasonably phased method of entry for all new entrants is in order.
 
 
 [6]
 These characteristics distinguish other FAA administrative actions elsewhere found final and reviewable. FAA letters indicating that proposed structures constitute "no hazard" to air traffic represent a definitive statement of the FAA's position on proposed construction and have been found reviewable. See Rochester v. Bond, 603 F.2d 927 (D.C. Cir.1979); Air Line Pilots Assoc. Int'l v. U.S. Department of Transportation, 446 F.2d 236 (5th Cir.1971). An FAA emergency revocation order, which had the determinate legal consequence of immediately suspending the air carrier's ability to conduct its business, was found reviewable despite the availability of administrative appeals. Nevada Airlines v. Bond, 622 F.2d 1017, 1019-20 (9th Cir.1980) (per curiam)
 Other cases have held that agency charges of statutory violations are not final agency action subject to review. The Third Circuit held in West Penn Power Co. v. Train, 522 F.2d 302 (3rd Cir.1975), that an Environmental Protection Agency notice of violation is not final agency action as "the only effect of a notice of violation is to make the recipient aware that the 'definitive' regulations are not being met and to trigger the statutory mechanism for informal accommodation which precedes any formal enforcement measures." Id. at 311. See also Georator Corp. v. Equal Employment Opportunity Commission, 592 F.2d 765 (4th Cir.1979) (EEOC determination of "reasonable cause" not final agency action); cf. International Tel. & Tel. Corp. v. Local 134, IBEW, 419 U.S. 428, 443, 95 S.Ct. 600, 609, 42 L.Ed.2d 558 (1975) (intermediate hearing under § 10(k) of the National Labor Relations Act not an adjudication; "we think that when Congress defined 'order' in terms of a 'final disposition' it required that 'final disposition' to have some determinate consequences for the party to the proceeding." Id. at 443, 95 S.Ct. at 610).
 
 
 [7]
 Cf. International Tel. & Tel. Corp. v. Local 134, IBEW, 419 U.S. 428, 444-45, 95 S.Ct. 600, 610-11, 42 L.Ed.2d 558 (1975) (intense practical pressure to conform to NLRB decision insufficient to convert intermediate NLRB proceeding into an "adjudication")
 
 
 [8]
 Shell Oil claimed that the Environmental Protection Agency had so coerced a state agency that the state agency's denial of a variance from water quality regulations was properly reviewable as federal action. This court affirmed a district court's dismissal of the complaint for lack of subject matter jurisdiction, noting the problems which would be created by such review:
 Federal programs "with strings attached" are characteristic of federal-state dealings today.... If state and federal governments may be treated like individuals for the purpose of deciding the existence of undue influence and the "overbearing" of the will of these sovereigns, these programs would be in serious constitutional jeopardy. The express conditioning of federal aid and the delegation of operational authority to states in compliance with federal guidelines are replete with "coercion." The unquestioned constitutional validity of these programs and other forms of cooperative federalism ... means that the concept of undue influence and duress are inappropriate in this context. Shell Oil, 585 F.2d at 413-14 (citations omitted).
 
 
 [1]
 Federal Trade Commission v. Standard Oil of California, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980); Abbott Laboratories, Inc. v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Gardner v. Toilet Goods Association, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 697 (1967); Flemming v. Florida Exchange, 358 U.S. 153, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); Columbia Broadcasting Sys. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942)
 
 
 [2]
 E. g., Sima Products Corp. v. McLucas, 612 F.2d 309 (7th Cir.1980); City of Rochester v. Bond, 603 F.2d 927 (D.C. Cir.1979); Investment Company Institute v. Board of Governors of the Federal Reserve Sys., 551 F.2d 1270, 1278 (D.C. Cir.1977); Continental Air Lines, Inc. v. CAB, 522 F.2d 107 (D.C. Cir.1974) (en banc); Deutsche Lufthansa Aktiengesellschaft v. CAB, 479 F.2d 912, 916 (D.C. Cir.1973); Air Line Pilots Association v. Department of Transportation, 446 F.2d 236 (5th Cir.1971); National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689 (D.C. Cir.1971). Cf. Puget Sound Traffic Association v. CAB, 536 F.2d 437 (D.C. Cir.1976) (no review of "interlocutory" decision to reopen investigation prior to issuing regulation)
 
 
 [3]
 I do not entirely comprehend the majority's statement that it is "loath to recognize a test of final agency action which would turn upon a regulated party's will to resist." The "will to resist," or, more specifically, whether the regulated party has chosen to abide by the agency determination or stand its ground and litigate the matter, goes primarily to the standing of third parties such as Air California to challenge the agency action. If, in this case, the airport operator had declined to take action in response to the FAA demands, Air California might not be viewed as "aggrieved" for standing purposes. Whether the regulated party has chosen to act, therefore, is important in determining who may bring an action for review of agency proceedings
 Whether the party has chosen to act or resist does not, on the other hand, help very much in the determination of when an action for review can be brought that is, when "finality" exists. A court might conclude from the regulated party's failure to act that finality did not exist, on the grounds that the agency might later abandon its position. Similarly, a court might conclude from the response of the regulated party that the agency has arrived at a final position. (Indeed, I would so conclude here.) The primary focus of a court's attention in determining finality, however, must be on what the agency has done, rather than the response of the regulated party.
 
 
 [4]
 I agree that the district court lacked jurisdiction of the action brought before it, but only on the grounds that, because the agency has taken action sufficiently final for review, this court has exclusive jurisdiction. Nevada Air Lines, Inc. v. Bond, 622 F.2d 1017 (9th Cir.1980)