SOUTHERN CALIFORNIA AERIAL ADVERTISERS' ASSOCIATION, Petitioner,

v.

FEDERAL AVIATION ADMINISTRATION, Respondent.

No. 87–7463.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1989.

Decided Aug. 1, 1989.

Scott D. Raphael, Newport Beach, Cal., for petitioner.

Mark B. Stern, Asst. U.S. Atty., Civ. Div., Washington, D.C., for respondent.

Before POOLE, BEEZER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Southern California Aerial Advertisers' Association ("petitioner") seeks review of the Federal Aviation Administration's ("FAA") decision to prohibit fixed-wing aircraft from traveling through a section of airspace west of Los Angeles International Airport ("LAX") known as the "shoreline transition." We declare that decision invalid because it was not issued in accordance with the requirements of the Administrative Procedure Act ("APA").

## FACTS

Petitioner is an unincorporated trade association comprised of approximately fifty individual commercial pilots and banner-towing operations based in Southern California. Petitioner's members have been making banner-towing flights along the Southern California coastline for over forty years. Their standard route hugs the coast from Northern San Diego County to the Ventura County line. This route requires petitioner's members to pass through an area west of LAX known as the "shoreline transition."

Federal aviation regulations classify the airspace directly over and west of LAX, including the shoreline transition, as a "terminal control area" ("TCA"). *See* 14 C.F.R. Part 71, Subpart K. Terminal control areas are areas of high density traffic surrounding airports. The FAA requires aircraft to obtain clearance from an air traffic controller before flying through a Group I or Group II TCA.[1] *See* 14 C.F.R. § 91.90. Aircraft wishing to travel through TCAs must also comply with special equipment requirements. *See id.*

Petitioner readily admits that, because the shoreline transition is part of a Group I TCA, its members must adhere to the clearance and equipment requirements noted above. Banner-towing aircraft that have traveled through the shoreline transition have carried the prescribed radio and navigational equipment and have been granted clearance from the LAX tower controllers who monitor the shoreline transition pursuant to an agreement with LAX TRACON, the controlling authority of the LAX TCA. Petitioner states that, prior to August of 1987, petitioner's members' requests to pass through the shoreline transition were always granted absent a traffic conflict. In case of a conflict, permission to proceed was generally granted after a delay. The fact that banner-towing aircraft have on occasion made more than forty requests a day for permission to travel through the shoreline transition attests to the importance of the shoreline transition to petitioner's members.

---

1. In order to scale operating rules to the individual needs of particular locations, the FAA has divided the TCAs into three groups. 35 Fed. Reg. 7782 (1970). The number of aircraft and the number of passengers using the airport determine the group to which the TCA is assigned, with Group I TCAs being the busiest and having the most stringent equipment and clearance requirements. *See id.* The TCA west of LAX is a Group I TCA.

In August of 1986, following a midair collision between an air carrier DC–9 and a single engine private plane in the LAX TCA over Cerritos, the FAA initiated an intensive review of the LAX TCA's configuration and operation. On August 10, 1987, as a result of this review, the FAA issued a notice of proposed rule-making altering the configuration of the LAX TCA. The FAA's concern over safety in the LAX TCA became more immediate when, on August 11, 1987, an American Airlines 737 nearly collided with a single engine aircraft inside the LAX TCA airspace reconfigured by the proposed rule. Shortly after this incident, on August 19, 1987, the FAA issued Special Federal Aviation Regulation 51 ("SFAR 51"), which, by immediate rule, raised the altitude of the LAX TCA and closed a passageway for small aircraft, known as a visual flight rules ("VFR") corridor, through the LAX TCA.

SFAR 51's closing of the VFR corridor prompted a good deal of outcry. Indeed, counsel for the petitioner in this case represented a number of national aviation groups that sought review of SFAR 51 before this court. In response to the concerns voiced by such groups, Administrator McArtor promised to establish two VFR transition routes in which pilots must comply with all TCA requirements and designated a "special flight rules area" which provides pilots with a direct north/south route that does not require air traffic controller authorization. The modified SFAR 51, including the "special flight rules area," became effective March 10, 1988. On March 18, 1988, this court dismissed as moot the petition for review of SFAR 51.

The letter at the center of this case was issued on August 18, 1987, in the context of the FAA's proposal to close the VFR corridor. James Holweger, Assistant Manager of the Air Traffic Division for the Western–Pacific Region of the FAA, wrote to Bob Cannon, petitioner's president, to inform him that the shoreline transition would no longer be an available route for fixed-wing aircraft. Holweger stated that the decision to close the shoreline transition to petitioner's members, as well as to other fixed-wing aircraft, was prompted by the increased work load for air traffic controllers that would result from implementation of SFAR 51, and by the FAA's concern over the safety of allowing banner-towing planes in the surface area of the LAX TCA.

Petitioner's members had entered into contracts before they received Holweger's letter that required them to display aerial ads along "the entirety of the Southern California beach front communities ... includ[ing] numerous Beaches north of LAX, which are accessible to plaintiffs' aircraft only by passing through the disputed airspace." Their reaction to Holweger's letter was not, therefore, one of pleasure. They felt, petitioner's counsel tells us, as Bay Area commuters would have felt if an impassable concrete or brick wall had been constructed across the center of the Golden Gate Bridge.

In October of 1987, Mr. Cannon met with FAA agents to discuss the closure of the shoreline transition to fixed-wing craft. No compromise emerged from these talks. On October 16, 1987, petitioner timely filed with this court a petition for review of Holweger's "order" permanently closing the shoreline transition.[2] We now confront the task of assessing the questions presented by this petition.

## JURISDICTION

Under 49 U.S.C.App. § 1486(a):

Any order, affirmative or negative, issued by the [Federal Aeronautics] Board or Secretary of Transportation under

---

**2.** Although our concern is only with this petition, we wish to note that petitioner pursued an additional strategy for obtaining relief from the Holweger rule. On May 18, 1988, petitioner filed with the district court an action for injunctive and declaratory relief from the mandate of the Holweger letter and for a temporary restraining order enjoining the FAA from enforcing that mandate. The FAA opposed the request for a temporary restraining order on three grounds: (1) under 49 U.S.C.App. § 1486(a), courts of appeals have exclusive jurisdiction to review FAA orders; (2) a district court and a court of appeals should not attempt to assert jurisdiction over a case simultaneously; and (3) petitioner had not met the requirements for injunctive relief. The district court case was dismissed on September 12, 1988.

[the Federal Aviation Act] ... shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order.

The parties agree without discussion that this statute confers upon us the authority to review the ban imposed by Holweger's letter on use of the shoreline transition by fixed-wing aircraft. We must, however, determine sua sponte whether 49 U.S.C. App. § 1486(a) grants us jurisdiction over this petition. *See Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377 (9th Cir. 1985) ("Although neither party raised the issue, a federal court must determine sua sponte its proper jurisdiction.").

There are two respects in which the ban imposed by the Holweger letter does not fit the literal terms of section 1486(a): the letter was issued by an FAA official rather than by the Board or Secretary, and the letter is not explicitly cast in the form of an order. As we explain below, neither of these facts precludes us from finding that the statute confers jurisdiction upon us to consider this petition.[3]

■ The fact that Holweger (an FAA official), rather than the Board or the Secretary, issued the ban on fixed-wing aircraft travel through the shoreline transition does not place this decision outside the scope of section 1486(a). The Federal Aviation Act vests the authority to regulate the safety of navigable airspace in the Secretary of Transportation. 49 U.S.C.App. § 1348(a). Congress has, however, charged the Administrator of the FAA with carrying out the duties and powers of the Secretary related to aviation safety. *See* 49 U.S.C. § 106(g). Thus, the Administrator acts on behalf of the Secretary when he issues rules and orders related to aviation safety. It therefore seems reasonable to assume that section 1486(a) confers jurisdiction upon us to review orders issued by the Administrator under the authority of section 1348(a). Moreover, case law supports the conclusion that our power to review the Administrator's orders extends to orders issued under the authority of the FAA though not by the Administrator himself. *See Air California v. United States Department of Transportation*, 654 F.2d 616 (9th Cir.1981); *City of Rochester v. Bond*, 603 F.2d 927 (D.C.Cir.1979).

■ Our subject-matter jurisdiction over this petition thus depends upon whether Holweger's letter may be viewed as an "order." Past decisions of this circuit have not formulated a clear method for determining whether agency action is an "order" within the meaning of section 1486(a). We have, however, noted three factors relevant to this determination. First, we have observed that the APA defines "order" broadly as "the whole or part of a final disposition ... of an agency in a matter other than rulemaking."[4] 5 U.S.C. § 551(6). *See Air California*, 654 F.2d at 620. Second, we have acknowledged that our power to review FAA orders has been judicially restricted to review of final agency orders. *Id.* Characteristics indicating finality include providing a "definitive" statement of the agency's position, having a "direct and immediate" effect on the day-to-day business of the complaining parties, having the "status of law," and carrying the expectation of "immediate compliance with [its] terms." *Id.* (quoting *Federal Trade Commission v. Standard Oil*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980)). By contrast, agency action lacking finality is more in the nature of "a threshold determination that further inquiry is

---

3. We further note that petitioner's failure to pursue administrative review of Holweger's decision is not relevant to a determination of whether we have authority to review that decision under § 1486(a). *See Nevada Airlines v. Bond*, 622 F.2d 1017, 1019 (9th Cir.1980).

4. Although we have not considered this issue, other circuits have implicitly interpreted "rule-making" to refer in this context only to formal rulemaking. *See Northwest Airlines v. Goldschmidt*, 645 F.2d 1309, 1313 (8th Cir.1981) (noting that recent case law has construed "order" in the context of statutes such as § 1486(a) to permit direct review of regulations promulgated through informal notice and comment rulemaking).

warranted." *Id.* (quoting *Federal Trade Commission v. Standard Oil,* 449 U.S. at 241, 101 S.Ct. at 493). Third, we have noted without relying on the fact that other circuits have adopted the view that whether agency action is an "order" within the scope of section 1486(a) depends on the adequacy of the administrative record. *See Morris v. Helms,* 681 F.2d 1162, 1163–64 (9th Cir.1982) (citing *Sima Products Corp. v. McLucas,* 612 F.2d 309 (7th Cir.1980) and *City of Rochester v. Bond,* 603 F.2d 927 (D.C.Cir.1979)); *see also Northwest Airlines v. Goldschmidt,* 645 F.2d 1309, 1314 (8th Cir.1981).

We are mindful of the principle that one who has been injured by agency action is presumptively entitled to judicial review. *See City of Rochester,* 603 F.2d at 931. We also recognize, however, that judicial review must be limited to a context where it may be informed. Based on these considerations, we hold that under section 1486(a) we may review a petitioner's claims regarding final agency action other than formal rulemaking so long as an administrative record adequate to permit evaluation of those claims exists.

Holweger's letter possesses the requisite finality. It has all but one of the characteristics of final agency action. It is a definitive statement of the FAA's position that had a direct and immediate effect on petitioner's members and that carried an expectation of immediate compliance with its terms. The letter's uncertain legal status is the only factor that weighs against finding it to be final agency action. Given that petitioner's members were expected to obey the rule set forth in the Holweger letter as if it were law, the informality of the letter does not undermine its essentially final character.[5]

We must now determine whether the administrative record is an adequate basis for evaluating petitioner's three claims. Petitioner alleges: (1) the ban on fixed-wing aircraft is void because it was not promulgated in compliance with the APA; (2) the ban is invalid because the manner in which it was issued deprived petitioner's members of their fifth amendment procedural due process rights; and (3) the ban is void because it violates 49 U.S.C.App. § 1349, which prohibits the creation of an exclusive right for the use of an air navigation facility. The entire administrative record in this case consists of the Holweger letter and the FAA's proposal for SFAR 51. This record, though sufficient to permit us to evaluate petitioner's two procedural claims, is not an adequate basis on which to rest a determination as to the substantive effect of the letter. We decline to consider the question of whether Holweger's letter created an exclusive right on the grounds that our jurisdiction encompasses only petitioner's first two claims.

---

**5.** Holweger's letter is clearly distinguishable from the letter from the Chief Counsel of the FAA to the Orange County Board of Supervisors at issue in *Air California,* 654 F.2d 616. We found that letter to lack finality because it was truly a "threshold determination." *Id.* at 620. The *Air California* letter simply stated the Chief Counsel's belief that the Board was in violation of the Airport and Airways Improvement Act and indicated that the FAA would pursue sanctions against the Board if steps toward compliance were not taken. After engaging in further correspondence with the FAA, the Board met and agreed to take steps toward compliance. *Id.* at 619. Air California, a third party adversely affected by compliance, sought judicial review of the letter prior to this meeting, contending that the Chief Counsel's interpretation of the Airport and Airways Improvement Act was incorrect and that the letter violated the mandates of the APA. *Id.* Were we to have granted judicial review of the Chief Counsel's letter, we would thus have been intruding into the administrative process and challenging the Board's decision to acquiesce in the FAA's interpretation. *See id.* at 621–22 ("Where the regulator and the regulated can achieve accommodation without resort to litigation, as here, we are reluctant to intervene at the behest of a third party.").

By contrast, granting judicial review of Holweger's letter would not require us to disturb an accommodation reached by the administrative process—the regulated party and not a third party is challenging the FAA's action. Moreover, whereas the terms of the *Air California* letter are conditional, threatening sanctions *if* steps toward compliance do not occur, the Holweger letter required *immediate* compliance. The only shared characteristic of the *Air California* letter and the Holweger letter is their informality. As noted above, however, we do not think this informality undermines the fact that the Holweger letter casts itself as final agency action that must be obeyed.

## COMPLIANCE WITH THE APA

The legal questions presented by this section are reviewable de novo. *See Linoz v. Heckler*, 800 F.2d 871, 875 (9th Cir.1986).

■ Holweger's letter portrays itself as a statement by the FAA that, because of safety concerns, FAA policy will henceforth be to refuse fixed-wing aircraft access to the shoreline transition. Such a statement falls within the APA's definition of a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy." 5 U.S.C. § 551(4).

The Federal Aviation Act requires that rules affecting the use of navigable airspace be issued in accordance with the procedures mandated by the APA. *See* 49 U.S.C.App. § 1348(d). The APA differentiates between substantive rules, on the one hand, and interpretive rules, general statements of policy, and rules of agency organization, on the other. *See* 5 U.S.C. § 553(b). While substantive rules "effect a change in existing law or policy," interpretive rules "merely clarify or explain existing law or regulations." *See Linoz v. Heckler*, 800 F.2d at 877 (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983)). Section 553 of the APA requires publication in the Federal Register of proposed substantive rules followed by a period for public consideration and comment. 5 U.S.C. § 553(b), (c). Interpretive rules are exempt from these notice and comment requirements. *See* 5 U.S.C. § 553(b), (c). A substantive rule is invalid if the agency has failed to comply with APA requirements. *Linoz v. Heckler*, 800 F.2d at 878.

The rule closing the shoreline transition to fixed-wing aircraft was not published in the Federal Register or offered for comment before it was issued to petitioner's members. Whether the rule is valid thus depends on whether it is interpretive or substantive in character.

Respondent asserts that Holweger's letter merely clarified the TCA regulations. These regulations, so the argument goes, clearly authorize denial of permission to a class of aircraft to travel on a route within the TCA. Neither the language nor the history of the TCA regulations support this argument. The first of the regulations simply specifies the airspace assignments that are designated as TCAs. *See* 14 C.F.R. Part 71 Subpart K. The second regulation states only that those wishing to operate aircraft in a Group I or II terminal control area must comply with pilot and equipment requirements and obtain air traffic controller authorization. *See* 14 C.F.R. § 91.90. The power to place an absolute ban on travel of a certain type of aircraft through a route in the TCA is not implicit in these regulations. Indeed, the Administrator of the FAA stated explicitly in the Federal Register that regardless of whether the requirements for TCA's result in increased delays, "all traffic will continue to be handled on a 'first-come-first-served' basis." 35 Fed.Reg. 7783 (1970). Respondent's argument that the Holweger rule is simply a rule interpreting the TCA regulations thus fails: the TCA regulations may allow air traffic controllers to refuse access to the TCA to individual aircraft on a case-by-case basis, but they do not grant the FAA the power to close routes within the TCA to all aircraft of a particular sort.

Respondent also argues that the FAA's failure to comply with the prescribed procedures for substantive rules is excusable because the Holweger letter was prompted by safety concerns. Federal aviation regulations state that the Secretary need not follow rulemaking procedures for rules issued under 49 U.S.C.App. § 1348(a) when those procedures are found to be "impractical, unnecessary, or contrary to the public interest." 14 C.F.R. § 11.61(b). The APA requires, however, that if noncompliance with its procedures is to be justified on the grounds that those procedures are "impractical, unnecessary, or contrary to the public interest," the rule must contain "a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(3)(B). Holweger's letter does not even mention normal notice and comment procedures, let alone explain why they could not be employed in promulgating the rule at hand.

In sum, we agree with petitioner that closure of the shoreline transition to fixed-wing aircraft represents a change from previous FAA policy of allowing access to this airspace on a first-come-first-served basis subject to air traffic controller authorization. The Holweger letter thus sets forth a substantive rule which is invalid because issued without publication and a comment period as required by the APA.[6] We do not wish to suggest that the notice and comment requirement is absolute. As noted above, the FAA may avoid these procedures when they are "impractical, unnecessary or contrary to the public interest" if the rule states the reasons therefor. *See* 14 C.F.R. § 11.61(b); 5 U.S.C. § 553(b)(3)(B). Moreover, the Federal Aviation Act provides that rules necessary to the safety of air commerce may be issued in an emergency without notice, so long as the Secretary immediately initiates proceedings relating to such rules and gives preference to those proceedings over all others. *See* 49 U.S.C.App. § 1485(a). The ban on fixed-wing aircraft travel through the shoreline transition fails to comply with either the procedural requirements imposed by the APA or the special emergency provisions recognized by the Federal Aviation Act.

## CONCLUSION

For the foregoing procedural reasons, we find that the ban on fixed-wing aircraft travel through the shoreline transition is invalid. The petition for review is GRANTED.

---

**6.** Because we find that the rule imposed by the Holweger letter is void, we need not reach petitioner's contention that the manner in which the rule was issued violated the procedural due process rights of its members.