

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-1-1998

# Aerosource Inc v. Secretary Transp

Precedential or Non-Precedential:

Docket 97-3313

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Aerosource Inc v. Secretary Transp" (1998). *1998 Decisions.* Paper 63.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/63

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 1, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3313

AEROSOURCE, INC.,
        Petitioner

v.

RODNEY SLATER, SECRETARY OF THE U.S.
DEPARTMENT OF TRANSPORTATION; BARRY
VALENTINE, ACTING ADMINISTRATOR OF THE FEDERAL
AVIATION ADMINISTRATION; U.S. DEPARTMENT OF
TRANSPORTATION AND FEDERAL AVIATION
ADMINISTRATION,
        Respondents

On Petition for Review of an Order
of the Federal Aviation Administration
(AC No. 43-15)

Argued March 9, 1998

BEFORE: GREENBERG, SCIRICA, and ALDISERT,
Circuit Judges

(Filed: April 1, 1998)

        Louise B. Cobbs (argued)
        Haight, Gardner, Holland & Knight
        2000 K Street, N.W.
        Suite 200
        Washington, D.C. 20006

         Attorneys for Petitioner

Frank W. Hunger
Assistant Attorney General
Robert S. Greenspan
Edward Himmelfarb (argued)
Attorneys, Appellate Staff
Civil Division, Room 9145
Department of Justice
601 "D" Street, N.W.
Washington, D.C. 20530-0001

David M. Wiegand
Mgr. General & Administrative
Litigation Branch, AGC-410
Office of the Chief Counsel
Litigation Division
Federal Aviation Administration
Washington, D.C. 20591

James S. Dillman
United States Department of
Transportation
400 7th Street, S.W.
Washington, D.C. 20590

 Attorneys for Respondents

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before the court on a petition for review of
a Federal Aviation Administration ("FAA") action brought by
Aerosource, Inc., pursuant to 49 U.S.C. S 46110(a).1 In the
_____


1. Aerosource in its petition for review relies only on 49 U.S.C. S 46110
as establishing our jurisdiction. In its brief, however, it also cites the
Administrative Procedure Act, 5 U.S.C. S 702, as a basis for us to
exercise jurisdiction. We are deciding this case under section 46110(a),
as the case has been briefed largely under 49 U.S.C. app. S 1486, the

alternative, anticipating that we might determine that we do not have appellate jurisdiction, Aerosource relies on our jurisdiction to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. S 1651(a), to achieve the relief it seeks in its petition for review.

A. Regulatory Framework

We find it useful at the outset to describe the regulatory framework in which this dispute has arisen. The Administrator of the FAA has a statutory responsibility to prescribe regulations and establish minimum standards to promote safe civil aircraft flight. See 49 U.S.C. S 44701(a)(2). Thus, the Administrator is responsible for establishing standards concerning various aspects of the inspection and servicing of aircraft and aircraft parts. See id. The FAA further is authorized to "examine and rate" stations and shops that repair2 aircraft and aircraft parts regarding the adequacy and suitability of the stations' equipment, facilities, and personnel. See 49 U.S.C. S 44707(2).

Pursuant to this statutory mandate, the FAA has promulgated regulations governing the issuance of repair station certificates, the ratings of such stations, and general operating procedures for certified stations. See 14 C.F.R. Part 145. A station's certificate specifies which types of equipment or components the FAA has certified the station to repair. This specification is known as a rating. See 14 C.F.R. SS 145.11, 145.31. Propellers, radio equipment, accessories, landing gear, and engines are examples of categories of ratings. A repair station's rating

_____

predecessor section to section 46110(a). We note, however that, as we explain below, the courts have looked to the Administrative Procedure Act in defining the term "order" for purposes of appeal under section 1486. See infra note 8. Thus, Aerosource's citation of 5 U.S.C. S 702 as a basis for our jurisdiction has not enhanced its jurisdictional contentions.

2. We use the term "repair" to refer to repair, maintenance, and overhaul of aircraft components. Although these terms refer to different procedures, the distinction is not relevant to the disposition of this case.

may be unlimited or limited as to the types of equipment or components or a specific model aircraft or engine. See 14 C.F.R. S 145.33. A repair station may repair any equipment or component for which it has been rated. See 14 C.F.R. S 145.51.

Stations applying for certification or rating must have adequate inspection procedures to ensure quality control and qualified inspection personnel. Once certified and rated to perform a particular repair, a certified station must have a qualified inspector inspect the equipment before it is approved for return to service on an aircraft. See 14 C.F.R. S 145.59(a). Certified stations have a duty to report defects or unairworthiness to the FAA. See 14 C.F.R.S 145.63(a). A certified station must allow the FAA to inspect the station for compliance with the regulations. See 14 C.F.R. S 145.23.

The FAA is required to publish "all reports, orders, decisions and regulations . . . in the form and the way best adapted for public use." 49 U.S.C. S 40114(a)(2). Pursuant to this authority, the FAA publishes two documents, Service Difficulty Reports ("SDRs") and General Aviation Airworthiness Alerts ("Alerts"), relevant here.

The Service Difficulty program is an information system intended to aid owners, operators, manufacturers, and the FAA in identifying problems encountered during aircraft service. The FAA receives relevant information from a variety of sources, including FAA inspectors, owners, operators, and certified repair stations. The FAA requests as much information as possible, even "insignificant reports," and maintains the information for five years to detect trends and failure rates. The FAA publishes a weekly summary of the collected service difficulty information in SDRs. The publication is distributed to the FAA's Flight Standards District Offices and Manufacturing Inspection District Offices and is available to the public at no charge.

Alerts contain information intended to assist maintenance and inspection personnel in performing their duties and provide a channel of communication through which the aviation community can exchange service experience and thereby improve the reliability, safety, and durability of aircraft products. The information in the Alerts

4

is selected from the monthly listing of SDRs on a particular product. Alerts primarily are directed toward a particular segment of the aviation community, but are circulated widely within the FAA.

B. FAA's Investigation of Aerosource

Aerosource is an FAA-certified repair station in Somerset, New Jersey. The FAA began an investigation of Aerosource in July 1996 which revealed various deficiencies. The investigation led to Aerosource and the FAA entering into a consent order in August 1996 providing for Aerosource voluntarily to surrender its unlimited accessory rating in exchange for limited accessory ratings and the FAA's promise that it would not unreasonably withhold or delay the approval and issuance of additional ratings to Aerosource.

Nevertheless, in October 1996, the FAA ceased adding parts to Aerosource's ratings because it had safety concerns which arose after execution of the consent order. Because the FAA did not provide Aerosource with a further explanation of its concerns at that time, Aerosource made a Freedom of Information Act request for its file. In response, the FAA produced a file in early December 1996, which revealed that one of Aerosource's customers, Raytheon Aerospace Company, had made inquiry of the FAA of the state of its investigation of Aerosource. The FAA responded to Raytheon by letter dated July 31, 1996, stating that the investigation was as yet inconclusive, but suggesting that "[i]f either of [two aircraft] parts were overhauled for your company by Aerosource, you may want to inspect the components for obvious problems and check performance." As a result, Raytheon removed several parts from stock which Aerosource had overhauled and contracted with certain of Aerosource's competitors for teardown and inspections of the parts. A teardown is a process in which the part is disassembled completely and is subjected to a detailed inspection. These repair stations performed the teardowns and reported various problems with Aerosource's maintenance of the parts.

In December 1996, the FAA circulated an SDR, dated

October 1996, which identified specific parts that Aerosource had repaired or overhauled improperly. The SDR warned the aviation community that Aerosource may have maintained other aircraft parts improperly.3 The SDR stated that an FAA investigation revealed that some components Aerosource had serviced had been returned to service notwithstanding their failure to meet manufacturer's specifications. In particular, the SDR named two specific components which "should be suspected as improperly maintained until further evaluations are performed." The notice stated that these components may be subject to early failure and that Aerosource had a system in place which may have resulted in the returning of components to service without proper maintenance. The notice recommended that anyone who had these particular components repaired by Aerosource take appropriate action to determine whether they met applicable standards. The SDR also requested any additional information that recipients of the SDR might have regarding the parts.

In December 1996, the FAA published an Alert which repeated the notice from the SDR concerning Aerosource virtually verbatim. The Alert, however, included the following disclaimer language: "This article is published as it was received, except for editorial changes." Both the SDR and Alert were based on the reports of the teardowns and inspections which Aerosource's competitors performed.

In early January 1997, Aerosource responded to the FAA's allegation and on January 9, 1997, met with the FAA to discuss the validity of the results of the teardown inspections. According to Aerosource, the FAA issued the SDR and Alert on the basis of unconfirmed, unwitnessed, and unverified conclusions by Aerosource's competitors, embodied in the teardown reports. More particularly, Aerosource alleges that these competitors made the teardown inspections without FAA supervision and under

_____

3. The timing of the publication of these notices is in dispute. According to Aerosource, the SDR was not published until December although it was dated in October. According to the FAA, there is no evidence that the SDR was not circulated until December. The discrepancy makes no difference to our outcome.

such circumstances as to render them unreliable. For example, one facility performed work for which the FAA had not certified it and another facility used a manual outdated for at least 12 years in conducting the inspection and used repair rather than inspection criteria.

On January 17, 1997, Aerosource wrote a letter to the FAA requesting that the FAA retract the notice published in the Alert concerning Aerosource. In support of its request, Aerosource cited the indications that the teardowns were unreliable. While the FAA did not retract the Alert it did restore Aerosource's unlimited accessory ratings on January 27, 1997, and closed the enforcement investigation based upon the teardown reports.

Since that time, the FAA has continued to refuse Aerosource's requests to rescind the Alert and the SDR as well. In these requests, Aerosource objected to the reliability of the information on which the SDR and Alert were based. Thus, on February 7, 1997, Aerosource wrote to the Director of the FAA's Flight Standards Service asking that the FAA issue "a special notice withdrawing an inaccurate notice" in the Alert.4 On March 27, 1997, Aerosource again wrote to the FAA, this time requesting a reconsideration of both the SDR and the Alert.

On March 28, 1997, the FAA denied these requests for rescission. The FAA's letter explained that, at the January 9 meeting, Aerosource presented sufficient information to justify the FAA's reexamination of the teardown reports. However, after reexamining all of the information collected during the investigation, the FAA found that the preponderance of the findings in the reports had been substantiated. The FAA also explained that Aerosource's ratings had been reissued because Aerosource was currently in compliance with all applicable regulations.

On April 18, 1997, Aerosource sent a letter to the FAA
_____

4. Having not yet received a response from the FAA, Aerosource wrote a similar letter on March 14, 1997, renewing its request for rescission of the Alert. Aerosource emphasized that the FAA would have to act promptly in order to prevent Aerosource from sustaining additional damage to its business.

requesting reconsideration of the denial. This letter challenged the FAA's explanation contained in its denial and made the same arguments as in its original request for rescission. The FAA denied this request on May 6, 1997, again stating that it based its decision not to rescind the notices upon a reexamination of all of the data. Further, the FAA explained that the reissuance of Aerosource's ratings "is an acknowledgment that, at this time, Aerosource meets the Federal Aviation Regulation requirements to provide maintenance services to the aviation community."

Aerosource then filed a petition with this court seeking review of the FAA's May 6, 1997 letter denying Aerosource's request to reconsider the FAA's denial of the request for rescission of the SDR and Alert.5 Alternatively, Aerosource seeks the same relief through the issuance of a writ of mandamus.

II. DISCUSSION

A. Review of FAA Action

Pursuant to 49 U.S.C. S 46110(a):

> a person disclosing substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Federal Aviation Administration with respect to aviation safety duties and powers designated to be carried out by the Administrator) under this part may apply for review of the order by filing a petition for review in the . . . court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

While Aerosource contends that we have jurisdiction under this section, the FAA argues that we do not have

_____

5. It appears that Aerosource was not aware that the FAA had issued the SDR until on or shortly before March 27, 1997. App. at 491. Thus, it had sought only a rescission of the Alert prior to that date. We, however, are not distinguishing between the Alert and the SDR in our disposition of this case.

8

jurisdiction to review the FAA action because the FAA has not issued an order within the meaning of this section.6 We are exercising plenary review on this point as we decide the issue through the application of legal principles.

We have not yet determined what constitutes an "order" within the meaning of 49 U.S.C. S 46110(a). In fact, few courts have addressed this statute,7 although many have interpreted its predecessor, 49 U.S.C. app. S 1486, which provided that:

> [a]ny order, affirmative or negative, issued by the Board or Secretary of Transportation under this chapter . . . shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia, upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order.

Courts uniformly imposed judicial limitations on section 1486, holding that it applied only to "final orders" of the FAA. See, e.g., Mace v. Skinner , 34 F.3d 854, 857 (9th Cir. 1994); Green v. Brantley, 981 F.2d 514, 519 (11th Cir. 1993); Atorie Air, Inc. v. FAA, 942 F.2d 954, 960 (5th Cir. 1991); Southern Cal. Aerial Advertisers' Ass'n v. FAA, 881 F.2d 672, 675 (9th Cir. 1989); Red River Transp. & Dev., Co. v. FAA, 630 F.2d 592, 594 (8th Cir. 1980).8

_____

6. The FAA does not deny that Aerosource filed its petition for review in the correct circuit and that it has disclosed a sufficiently substantial interest to maintain these proceedings.

7. The Court of Appeals for the Ninth Circuit is apparently the only court of appeals which has addressed this section, but the holding of this case is not relevant here. See Tur v. FAA, 104 F.3d 290 (9th Cir. 1997) (holding that the district court lacked jurisdiction to entertain a claim for rescission of an order because the statute vests exclusive jurisdiction for such claims in the court of appeals).

8. In interpreting the term "order" as used in this section, some courts have looked to the use of the term in the Administrative Procedure Act. See, e.g., Southern Cal. Aerial Advertisers' Ass'n, 881 F.2d at 675. The APA broadly defines "order" as "the whole or part of a final disposition . . . of an agency in a matter other than rulemaking. . . ." 5 U.S.C. S 551(6).

9

Thus, courts have held that the term "order" in section 1486 "applies to an[y] agency decision which imposes an obligation, denies a right, or fixes some legal relationship" and which is final. Mace, 34 F.3d at 857 (internal quotation marks omitted); see also Atorie Air, Inc., 942 F.2d at 960; Shea v. Office of Thrift Supervision, 934 F.2d 41, 44–45 (3d Cir. 1991) (using the same language to describefinal agency actions).

In determining what constitutes a final FAA order under section 1486, the courts have found that the "order" need not be formal. Thus, letters and other communications can be final orders depending upon the surrounding circumstances and other indicia of finality. Compare Tur v. FAA, 104 F.3d 290 (holding that a consent decree was an "order" within the meaning of section 46110(a)); Air One Helicopters, Inc. v. FAA, 86 F.3d 880 (9th Cir. 1996) (holding that an FAA opinion letter was a reviewable order because administrative remedies were futile); Kemmons Wilson, Inc. v. FAA, 882 F.2d 1041 (6th Cir. 1989) (FAA letter was final order), with Blincoe v. FAA, 37 F.3d 462 (9th Cir. 1994) (letter not final order where by its terms the letter suggested that the administrative process was incomplete); Air California v. United States Dep't of Transp., 654 F.2d 616 (9th Cir. 1981) (letter warning of impending action not final); Red River Transp. & Dev., Co. v. FAA, 630 F.2d 592 (tentative language of FAA letter rendered it not final). Similarly, to be final for purposes of review, the "order" need not be the product of formal agency decision making, see Southern Cal. Aerial Advertisers' Ass'n, 881 F.2d at 675; Sima Prods. Corp v. McLucas, 612 F.2d 309, 312 (7th Cir. 1980), and "orders" are reviewable under section 1486 even though the administrator of the FAA has not issued them, see Southern Cal. Aerial Advertisers' Ass'n, 881 F.2d at 675. In addition, it has been held that to be appealable, the "order" must be predicated on an administrative record sufficient to allow a court to engage in a meaningful review of the order. See Atorie Air, Inc., 942 F.2d at 960; Green v. Brantley, 981 F.2d at 519; Sierra Club v. Skinner, 885 F.2d 591, 593 (9th Cir. 1989).

We have not addressed the proper limits to "order" as used in section 1486, and therefore have not had the

10

occasion to decide whether to accept the limitations on what constitutes an order which other courts universally have imposed. Yet, given the similarity between section 1486 and its successor, section 46110(a), there seems to be no reason why the judicial limitations should not apply equally to section 46110(a), the current version of the statute.[9] Moreover, the parties do not argue that this court should interpret the term "order" differently than have other courts of appeals. Thus, we conclude that to be reviewable under section 46110(a), an "order" must be final, but need not be a formal order, the product of a formal decision-making process, or be issued personally by the Administrator. Of course, it also must impose an obligation, deny a right, or fix some legal relationship. [10]

There are three FAA actions relevant in determining whether Aerosource's petition seeks to review an order and thus whether we have jurisdiction: (1) the issuance of the SDR and Alert; (2) the March 28, 1997 letter refusing to rescind the SDR and Alert; and (3) the May 6, 1997 letter refusing to reconsider its decision not to rescind the SDR and Alert. As discussed above, a finding that these actions, or any one of them, is final is not precluded by their lack of formality, see Tur, 104 F.2d at 292; Air One, 86 F.3d at 882, the lack of a formal hearing in this case, see, e.g.,

_____

9. The parties do not argue this point in their briefs to this court. Rather,
they cite the cases dealing with section 1486 as though they were decided under section 46110 without acknowledging the change in statutory language. Thus, they silently assume that we likewise would impose a finality requirement.

10. We are not predicating our ruling on a possible insufficiency of the administrative record, as we find the record sufficient for us to make a meaningful review. In fact, we make that review in considering Aerosource's application for mandamus relief. In this regard, we point out that an agency action not predicated on an administrative record permitting meaningful review could impose substantial obligations on a petitioner who thus reasonably could contend that it is entitled to review without regard for the state of the record. We observe that while the courts recite that an appealable order must be based on a record sufficient to permit a meaningful review, they regularly find the record adequate for that purpose. We leave to another day the determination of whether, and if so how, a court would exercise appellate jurisdiction notwithstanding an inadequate record for the review.

11

Southern Cal. Aerial Advertisers' Ass'n, 881 F.2d at 675, or the fact that the Administrator did not personally issue the letters, see id. Thus, the focus of our inquiry is on whether one of these actions had the type of effect required of a "final" agency action.

In determining whether there is a final agency action, the Supreme Court has stated that the "core question is whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 2773 (1992). The action must be a "definitive statement[ ] of [the agency's] position" with concrete legal consequences. See FTC v. Standard Oil Co., 449 U.S. 232, 241, 101 S.Ct. 488, 493 (1980) (internal quotation marks omitted).

In Standard Oil, the Supreme Court held that the Federal Trade Commission's ("FTC") issuance of a complaint was not a final agency action and therefore was not reviewable under the Administrative Procedure Act. See Standard Oil, 449 U.S. at 238, 101 S.Ct. at 492. The Court reasoned that the complaint was, by its terms, not a definitive statement; rather, the complaint was only indicative of the FTC's "reason to believe" that the party was violating the law. See id. at 241, 101 S.Ct. 493-94. The Court found that the complaint did not have the legal force or practical effect on the party's daily business activities indicative of a final agency determination. See id. at 242, 101 S.Ct. at 494. The Court recognized that the complaint imposed the substantial burden of responding to the allegations, but noted that this was "different in kind and legal effect from the burdens attending what heretofore has been considered final agency action." See id. at 242, 101 S.Ct. at 494. The Court noted that this burden is the same as that accompanying any major litigation, but not the same type of effect as requiring a company to change its daily operations and expend resources investing in new equipment. See id.

The Standard Oil Court also rejected the argument that the petitioner's request of the Commission to reconsider the issuance of the complaint somehow rendered it a definitive agency action. See id. at 243, 101 S.Ct. at 495. The Court

12

recognized that such a request, and the Commission's subsequent denial of it, likely exhausted petitioner's administrative remedy with regard to whether the Commission had the required "reason to believe" that the petitioner was violating the law. See id. But the Court held that the issuance of a complaint is a step toward, and ultimately will merge into, the Commission's decision as to whether the party violated federal law. See id. at 246, 101 S.Ct. at 497.

We have applied a factored analysis to determine whether an agency's action is final. See In re Seidman, 37 F.3d 911, 923 (3d Cir. 1994). An order's finality is "informed but not decided by an agency classification" and is characterized by the following five factors:

> (1) whether the decision represents the agency's definitive position on the question; (2) whether the decision has the status of law with the expectation of immediate compliance; (3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; (4) whether the decision inv olves a pure question of law that does not require further factual development; and (5) whether immediate rev iew would speed enforcement of the relevant act.

Id. at 923 (quoting CEC Energy Co. v. Public Serv. Comm'n, 891 F.2d 1107, 1101 (3d Cir. 1989)). This formulation is in accord with the Supreme Court's conclusion that the following are indicia of finality in the context of other agencies' actions: a definitive statement of the agency's position which has a direct and immediate effect on the petitioner's day-to-day operations, which has the status of law, and of which immediate compliance is expected. See Standard Oil, 449 U.S. at 239, 101 S.Ct. at 493.

As noted above, considering the SDR and the Alert together, there are three FAA actions which might be treated as orders subject to review. Aerosource contends that the May 6 letter was a final order reviewable under 49 U.S.C. S 46110(a) and thus its petition seeks review of that letter. Yet we also must consider the finality of the SDR and the Alert and the March 28 letter, as the finality of the May 6 letter depends on the finality for purposes of review of

13

these earlier documents. After all, if a court treated the denial of an application to reconsider an action which is not in itself a final order as a final order, then a petitioner simply by asking for reconsideration could convert a nonfinal action into a final order. Of course, this conversion should not be permitted. See Standard Oil, 449 U.S. at 243, 101 S.Ct. at 495 ("But the Commission's refusal to reconsider its issuance of the complaint does not render the complaint a `definitive' action.").[11] Accordingly, the FAA primarily alleges that neither the March 28, 1997 letter nor the May 6, 1997 letter can be a final order unless the SDR and Alert are themselves final. We discuss each of these FAA actions with respect to their finality.

1. SDR and Alert

We agree with the FAA that the SDR and Alert were not final orders because their conclusions were tentative and indicative of an on-going investigation. Thus, they are like the complaint issued in Standard Oil, which the Supreme Court found was not a final, reviewable order. Indeed, it is impossible to characterize either the SDR or the Alert as announcing, as set forth in Seidman, the FAA's definitive statement, as both publications merely gave advisory information predicated on information supplied to the FAA.

The SDR and the Alert were similar to a letter of which a petitioner in the Court of Appeals for the Eighth Circuit sought review in Red River Transport & Dev., Co., 630 F.2d 592. There, the court held that the letter was not a final order as it merely notified the petitioner of an on-going investigation and requested the petitioner to submit any evidence which it cared to offer in regard to the investigation. In addition, by its terms, the letter in Red River did not make any final conclusions or decisions; rather, it stated that "[i]f the facts as stated are correct, it

_____

11. We are not implying that in no circumstance could a denial of a request for reconsideration of some action which, in itself, was not a final order not be a final order subject to judicial review. Obviously, we are only ruling on the situation before us. Conceivably the denial of the reconsideration could have consequences going beyond the underlying action. But this situation is not present here.

14

appears that there may have been a violation" of federal regulations and "[s]hould this investigation substantiate that a violation did or did not occur, you will be informed accordingly." Id. at 593-94.

The SDR and Alert were also, by their terms, tentative. The notices stated that certain components were suspected as being improperly serviced by Aerosource and requested any additional information which their recipients could produce. But the SDR and the Alert were nothing more than what their names implied, for they were advisory in nature. They imposed no obligations, denied no right, and did not fix or alter a legal relationship. Indeed, the Alert recited that the information it contained was significant but not "evaluated fully by the time the material went to press." Thus, neither the SDR nor the Alert had the force of law.

2. March 28, 1977 Letter

The FAA issued a letter on March 28, 1997, denying Aerosource's request to rescind the Alert and SDR. 12 In that letter, the FAA summarized the course of the investigation, including the source of the information in the SDR and Alert and the FAA's meeting with Aerosource resulting in the FAA's reexamination of the data on which the SDR and Alert were based. The FAA then stated that:

> [w]e have completed our reexamination of all the data that has come to our attention during this investigation. This includes an analysis of the tear-down reports . . . . After compilation and review of all of the results, we found that a preponderance of those original findings has been substantiated.
>
> We understand Aerosource's concern because of our publication of the Alert and SDR. However, in the interest of aviation safety, and our duty to safeguard the flying public, we have no recourse but to allow the FAA Alert and SDR to stand as published.

App. at 494-95.

_____

12. The FAA, but not Aerosource, characterizes the letter as acting on a request for reconsideration.

15

This letter evinces the FAA's intent not to rescind the SDR and Alert and establishes that the FAA found that the information in the SDR and Alert was not unfounded. Nevertheless, it did not impose an obligation, deny a right, or fix some legal relationship. The only thing denied in this letter is the "right" to the rescission of the publications. The letter did not require Aerosource to do anything, and there is nothing in the letter with which Aerosource is expected to comply. Indeed, the letter did nothing more than leave Aerosource in the position it was in after the SDR and Alert were issued.

3. May 6, 1977 letter

After the FAA denied Aerosource's request to rescind, Aerosource sent another letter to the FAA on April 18, 1997, urging the FAA to reconsider its decision. The FAA responded by letter of May 6, 1997, denying Aerosource's request to reconsider the FAA's decision not to rescind the Alert. In so denying, the FAA stated that "[o]ur decision not to withdraw the Alert was based upon a reexamination of all the data that came to our attention during the investigation." Aerosource argues that the FAA's May 6 letter refusing to rescind the SDR and Alerts was a final order which we may review under 49 U.S.C. S 46110. In so arguing, Aerosource cites excerpts from the FAA's various correspondences with Aerosource, and states that"[t]hese letters make clear that the FAA has reached afinal reviewable decision." Br. at 20 n.10 (emphasis added). Aerosource's arguments treat the March 28 letter as merging into the May 6 letter.

It is clear that this May 6 letter represents the FAA's final position on the issue of whether it will rescind the SDR and the Alert. However, this letter does not anticipate that Aerosource will comply with any directive, as the letter sets forth nothing with which it must comply. Thus, the May 6 letter no more imposed legal obligations, fixed rights, or altered a legal relationship than did the March 28, 1997 letter or the SDR or the Alert themselves. At bottom, therefore, this case concerns nothing more than the issuance of advisory warnings and the FAA's refusal to withdraw the warnings predicated on its conclusion that it

16

properly had issued them. Neither Aerosource nor any other entity suffered any legal consequences as a result of the issuance of the SDR or the Alert or from the sending of the letters.

We, of course, recognize the severe adverse impact the SDR and the Alert had on Aerosource's business. It is quite natural that in the sophisticated market for aircraft parts repair services the customers would be aware of and mindful of an SDR and an Alert and would take the information in such documents into account when seeking repair services. Undoubtedly Aerosource's customers did exactly that. Nevertheless, we have concluded that in view of all the circumstances of this case none of the documents at issue here can be regarded as a reviewable order. Moreover, contrary to Aerosource's contention, the fact that the FAA's actions were directed at a single company rather than at the industry at large does not affect our result as none of the materials has the indicia of an order. Furthermore, we see no reason why a mandatory direction to an entire industry could not be an order. Thus, we will not create a criterion for an FAA action to be an order that it affect only a single company. Nor will we hold that an action affecting a single company necessarily is an order. Thus, we reject Aerosource's contention that the FAA has de facto decertified it, thus entering an order against it.

In reaching our result, we quite naturally consider our recent decision in Hindes v. FDIC, 1998 WL 65978 (3d Cir. Feb. 19, 1998). In Hindes, the FDIC notified the Meritor Savings Bank that unless Meritor satisfied certain capitalization requirements the FDIC would cancel its deposit insurance. The demand created a crisis which led the Pennsylvania Secretary of Banking to close the bank and appoint the FDIC as its receiver on the same day that the FDIC notified Meritor of its capitalization requirements.

The impact of the FDIC's notice on Meritor was dramatic. Nevertheless, we held that the Notification was not a final agency action for purposes of APA review. We pointed out that the Notification was not the FDIC's definitive statement, did not impose an obligation, deny a right, or fix a legal relationship. Rather, the Notification was merely the first step of a multi-step statutory procedure which could

17

lead to the termination of the institution's deposit insurance. Id. at *11–*12. Thus, we concluded that the district court did not have jurisdiction to review the Notification. Id.

We recognize that the language of the APA in 5 U.S.C. S 702 differs from that in section 46110(a). Yet similar principles apply under both statutes. See, e.g., Southern Cal. Aerial Advertisers' Ass'n, 881 F.2d at 675. Moreover, on the facts in Hindes, an arguably even stronger case for judicial review could be made than has been made here. After all, in Hindes, the Notification required Meritor to take action, failing which the FDIC would initiate an administrative proceeding.13 Indeed, the impact of the Notification on Meritor reasonably may be characterized as more severe than the impact on Aerosource of the SDR and the Alert. Yet in Hindes we held that the district court did not have jurisdiction to review the issuance of the Notification because, inter alia, "it was not a final agency action." Id. at *11.14

B. Mandamus

As we have indicated, Aerosource contends that alternatively we have jurisdiction to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. S 1651(a). Thus, it requests that if we conclude that we do not have jurisdiction pursuant to its petition for review, we treat the petition as seeking a writ of mandamus and that through this device we compel the FAA to rescind the SDR and Alert. Mandamus is only appropriate where the petitioner can establish that it has no alternative, adequate remedy and that its right to the writ is clear and indisputable. See Rhoune–Poulenc Rorer, Inc., 32 F.3d 851,

_____

13. The Secretary of Banking's action obviated the need for the administrative proceeding.

14. The FAA, relying on ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 107 S.Ct. 2360 (1987), contends that the petition for review which Aerosource filed on June 9, 1997, was not timely as it could have been timely only if measured from May 6, 1997, when the second letter at issue here is dated. In view of our result, we have no need to reach this argument and to spell out its nuances.

18

861 (3d Cir. 1994). In addition, the petitioner generally must show irreparable injury caused by the error. See United States v. Wexler, 31 F.3d 117, 128 (3d Cir. 1994). We have reviewed Aerosource's mandamus argument carefully and find that while it has no adequate alternative remedy and that its injury has been severe, nevertheless on the facts its right to the writ is not clear and indisputable. Consequently, we are constrained to deny Aerosource's petition insofar as it seeks mandamus.

III. CONCLUSION

For the foregoing reasons, the petition for review is dismissed and, treating the petition as seeking a writ of mandamus, mandamus is denied.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

19